The State, ex rel. Worrell, v. Peelle.

No. 15,480.

THE STATE, EX REL. WORRELL, v. PEELLE.

OFFICE AND OFFICER.—*Executive Appointment Before Vacancy.—Surrender of Office by Incumbent.*—An appointment made by the Governor to an office rightfully held at the time of the appointment by an incumbent, whose term has not expired, is void. The surrender of the office to the appointee by such incumbent does not validate his void appointment, nor can any future act of the Governor validate such appointment.

SAME.—*Chief of Bureau of Statistics.—Certificate of Election by Legislature.—Governor's Commission.*—The General Assembly, assuming to divest the Governor of the power to appoint the chief of the bureau of statistics, in contravention of the Constitution, itself elected such officer. Upon his election, a certificate thereof having been presented to the Governor, the Governor issued to him a commission in which was recited the nature of his title, and that he was commissioned as the elect of the General Assembly. It further appeared by the records of the executive office that the commission was issued because of the election by the General Assembly.

*Held*, that the issuing of the certificate was not the exercise of the appointing power, and conferred no title to the office.

SAME.—*Records of Governor's Office.—Evidence.*—The records of the Governor's office mentioned above are competent evidence in a suit by a subsequent appointee of the Governor contesting the right of such person commissioned by the Governor to hold the office.

SAME.—*Appointee of Legislature under Void Election.—Governor's Commission. —Effect of.*—A commission issued by the Governor to an appointee of the Legislature under a void election, which recites that it is issued because of such election, can not be given the effect of an executive appointment upon the theory that all persons being presumed to know the law, the Governor knew that the sole power of appointment was possessed by him, and not by the Legislature, at the time of the issuing of the commission.

SAME.—A commission by the Governor to an officer, which recites that the person commissioned derives his claim of title because of an election by the Legislature, and is commissioned because thereof, is conclusive that such person is not the Governor's appointee.

MITCHELL, C. J., and ELLIOTT, J., dissent.

From the Marion Superior Court.

*L. T. Michener*, Attorney General, *A. C. Harris, A. J. Beveridge, J. H. Gillett, L. M. Campbell* and *F. H. Blackledge*, for appellant.

*J. E. McCullough, L. P. Harlan* and *S. J. Peelle*, for appellee.

BERKSHIRE, J.—This is the second time this case has been in this court. *State, ex rel.*, v. *Peelle,* 121 Ind. 495.

When the case was first before the circuit court judgment was rendered for the appellee upon a demurrer to the complaint. From the judgment so rendered an appeal was prosecuted to this court.

In this court the judgment was reversed, and the cause remanded, with directions to the court below to overrule the demurrer to the complaint.

When the cause again came before the circuit court the appellee answered in two paragraphs.

The first paragraph was a special denial, and the second paragraph the general denial.

It would have been proper practice had the appellant filed a motion to strike out the first paragraph as an encumbrance to the record, notwithstanding there would have been no available error had such a motion been filed and overruled.

Several paragraphs of reply were filed to the first paragraph of answer, but regarding it as a mere denial of the allegations in the complaint, the reply becomes wholly without importance.

The cause being at issue was submitted to the court for trial, and a finding made thereafter for the appellee.

The appellant moved the court for a new trial, which motion the court overruled, and the proper exception was reserved.

Judgment was then rendered for the appellee, and from that judgment this appeal is prosecuted.

When the case was here the first time the whole contention was as to the power of the Legislature under the Constitution to designate the incumbent to the office in question.

The appellee rested his claim to the office upon an election by the Legislature, and the appellant's relator relied upon an appointment from the executive of the State.

The appellee now claims title to the office by virtue of an

appointment from the executive of the State, while the appellant's relator assumes the same position as heretofore.

After the cause had been remanded to the court below, as the appellee had not yet addressed an answer to the complaint, he was not debarred from setting up by way of answer a different claim of title than the one already considered by this and the court below, if he in good faith believed he held any different title.

And the question now is, does the appellee hold the office in question by appointment from the executive department of the government?

As we now understand the position of the appellee, it is that he holds the office (1) by appointment from Governor Porter, and (2) by appointment from Governor Gray.

For two sufficient reasons the appellee received no appointment to the office in question from Governor Porter, the second of which applies with equal force to the action of Governor Gray :

*First.* At the time the appellee claims to have received his appointment from Governor Porter John B. Conner, Esq., was rightfully holding the office, and his term of office did not expire for one and one-half months thereafter. That the Governor could make no valid appointment under such circumstances it is only necessary to cite the well-considered case of *State, ex rel.,* v. *Harrison,* 113 Ind. 434. But the contention is urged that even if the appointment was void when made, as Conner thereafter surrendered the office to the appellee, his appointment was thereby validated.

This position can not be maintained. The appointment being void at its inception, no act of the Governor could thereafter give it validity. It will hardly be expected that we take the time to cite authorities to support so plain a proposition. And it is sufficient to say that if the Governor could not validate his own void act Conner could not do so for him.

The surrender of the office by Conner to the appellee, we

think, amounted to an abandonment thereof and created a vacancy therein, but if there were any doubt as to this proposition both parties have so treated it, and for all the purposes of this case we are bound to so hold.

After the vacancy had been created the Governor was authorized to fill it by appointment, and could have appointed the appellee, and if this had been done the appellee would have held the office by virtue of the appointment then made, and not because of the commission issued to the appellee before Conner abandoned the office.

Upon the question that the surrender of an office by its rightful incumbent to one claiming title thereto without right, does not give to the latter title thereto, we refer to *Turnipseed* v. *Hudson*, 50 Miss. 429 (19 Am. Rep. 15).

The second reason why the appellee did not secure an appointment from the executive is that the appointing power lodged with him under the Constitution was never invoked in behalf of the appellee, and so long as it was not called into exercise there could be no appointment, although the Governor could at any time call it into action.

It appears that the General Assembly assumed (and it was but an assumption) to take from the executive department the power therein vested under the Constitution to designate the incumbent of the office in question, and not only so but to legislate the rightful incumbent of said office out of office before the expiration of his term, and to take unto themselves the election of an incumbent to said office, and as the result the General Assembly elected the appellee and gave him a certificate of election.

The first election occurred on the 3d day of March, 1883, and upon a certificate thereof being presented to the executive he issued the following commission :

"*The State of Indiana.     To all who shall see these Presents, Greeting :*

" Whereas, It has been certified by the proper authority that, at a joint convention of the two Houses of the fifty-

third General Assembly, held in the hall of the House of Representatives, March 3d, 1883, that William A. Peelle, Jr., was elected Chief of the Bureau of Statistics.

" Therefore, Know ye, that in the name and by the authority of the State aforesaid, I do hereby appoint and commission William A. Peelle, Jr., Chief of the Bureau of Statistics aforesaid, to serve as such for the term of two years from the 8th day of March, 1883, and until his successor shall have been elected and qualified.

" In witness whereof, etc.

" By the Governor:          ALBERT G. PORTER.

" W. R. MYERS, Secretary of State."

There was no pretence that the appellee held any other title to the office than that which the said election conferred upon him, and when we remember the aggressive attitude of the General Assembly at that time with reference to its power to elect the incumbents to a large class of offices, including the one in question (and of this we take judicial knowledge), the appellee would not have been willing to have recognized the executive department as the source of his title.   The Governor was careful to recite in the commission the nature of the appellee's title and that he commissioned him as the chosen of the General Assembly.   That it was the purpose and intention of the Governor, when he issued the commission, to deliver to the appellee the evidence of his title as derived from the Legislature, and to make it distinctly appear that he was in no sense the appointee of the executive, is so manifest that there is no ground for a contrary contention to rest upon.   But in addition to what appears on the face of the commission; the records of the executive office disclose the fact that the commission was issued to the appellee because and on account of his election by the General Assembly.   We know of no sufficient reason why these records are not competent evidence.   They are the records kept in a public office of the official acts of the chief executive officer of the State.

But see *Marbury* v. *Madison*, 1 Cranch, 137. But it still further appears that after the appellee received his commission from Governor Porter he recognized the Legislature, and not the executive, as the source from which he derived title to the office.

The following is the oath which was administered to him and endorsed on his commission :

*"State of Indiana, Marion County, ss. :*

" I, William A. Peelle, Jr., do solemnly swear that I will support the Constitution of the United States and of the State of Indiana, and that I will honestly and faithfully discharge my duties as Chief of the Bureau of Statistics, for the term for which I have been elected, to the best of my ability, so help me God.     WILLIAM A. PEELLE, JR.

" Subscribed and sworn to before me this 9th day of March, 1883.     S. P. SHEERIN, Clerk Supreme Court."

But it is contended that by some kind of legal fiction the appellee, each time he was commissioned by the Governor, became his appointee.

This contention is not very clearly defined, but proceeds, as we understand it (in part, at least), upon the theory that all persons are presumed to know the law, and that this presumption applies as well to public officers as to individuals ; and, as Governors Porter and Gray are presumed to have known, when they commissioned the appellee, that the General Assembly had no power to elect him to the office, that the presumption must prevail that they intended by their official acts in commissioning him to appoint him to the office, and that this presumption must prevail, over their expressed intention to the contrary ; or, to express the contention in other language, though they intended by their official acts to do one thing, and, in fact, did what they intended, that in law they did something else. This is carrying the doctrine of presumptions beyond precedent, and, we think, beyond reason.

For some purposes the presumption contended for prevails,

but it is never applied to a question such as we now have under consideration.

It is usually recognized in the construction of contracts, and the enforcement of penal statutes; but we know of no case where it has been allowed to give to the official act of a public officer a different legal effect than the act itself expressly declares was intended. See *Citizens, etc., Savings Ass'n* v. *Friedley,* 123 Ind. 143.

On the 9th day of February, 1885, the Legislature again elected the appellee to the office in question, and thereafter, upon a certificate of election, the Governor issued to him a commission.

In 1887 there was no election, and the appellee continued to hold the office until 1889, when the Legislature again elected him to the office, and on presentation of his certificate of election to the Governor, a commission was refused, and the Governor having appointed the appellant's relator and commissioned him, this controversy arose.

The following is the appellee's commission from Governor Gray:

"*The State of Indiana, To all who shall see these presents, Greeting:*

"Whereas, It has been certified to me by the proper authority that William A. Peelle, Jr., has been elected to the office of chief of the bureau of statistics, of the State of Indiana, by the General Assembly on the ninth day of February, A. D. 1885.

"Therefore, Know ye, that in the name and by the authority of the State aforesaid, I do hereby commission the said William A. Peelle, Jr., as said chief of the bureau of statistics of the State of Indiana for the term of two years from the eighth day of March, 1885, and until his successor shall have been elected and qualified.

"In witness whereof, etc.

"By the Governor:                    ISAAC P. GRAY.

"WILLIAM R. MYERS, Secretary of State."

We have nothing to add with reference to Governor Gray's action, except to say that he seemed to be more careful, if possible, than his predecessor to emphasize the fact that the appellee was not his appointee, but was commissioned as the chosen of the General Assembly. The word "appoint" is found in the commission issued by Governor Porter, but nowhere appears in that of Governor Gray.

But the further contention of the appellee is, that as the appointing power was lodged with the executive of the State, his purpose or intention in commissioning the appellee can not be inquired into ; that notwithstanding the purpose is disclosed in the face of the commission, all of its recitals must be disregarded, and the commission treated as an appointment made by the executive. Much that we have already said is here applicable.

This is but contending for a conclusive presumption that you must take an officer to mean one thing when he does another.

As the appointing power was lodged in the executive when he commissioned the appellee, had the commission recited an appointment, or had it been silent as to the source of the appellee's title to the office, then no doubt the commission would have been conclusive, for the very good reason that the mental operations of the Governor's mind, unexpressed in the act, could not be inquired into, and if for no other reason such inquiry would be impracticable. But where the source of title is lodged somewhere else than with the executive, his commission is only *prima facie* evidence of title. *Board, etc.,* v. *State, ex rel.,* 61 Ind. 379 ; *Reynolds* v. *State, ex rel.,* 61 Ind. 392 ; *Hench* v. *State, ex rel.,* 72 Ind. 297 ; *State, ex rel.,* v. *Chapin,* 110 Ind. 272 ; *Marbury* v. *Madison, supra.*

This court has gone so far as to hold that even after the Governor has issued a commission, if it appears that he has commissioned a wrongful claimant, to the prejudice of one

The State, *ex rel.* Worrell, *v.* Peelle.

who is rightfully entitled to the office, he may issue the second commission. *Gulick* v. *New*, 14 Ind. 93.

The same reasons which make the Governor's commission conclusive, when silent as to the source of title, that the person commissioned is the Governor's appointee, where he has the power to appoint an incumbent to an office, render his commission conclusive that such person is not his appointee when it recites that the person commissioned derives his claim of title because of an election by the people or Legislature, and is commissioned because thereof.

We hold that when the appellant's relator was appointed there was a vacancy in the office, which the Governor was empowered to fill by appointment until there should be an election by the people.

Judgment reversed, with costs.

Filed May 15, 1890; petition for a rehearing overruled Sept. 17, 1890.

## DISSENTING OPINION.

ELLIOTT, J.—I am so strongly convinced that the law is with the appellee that I can not assent to the prevailing opinion. The importance of the question involved requires a statement of my reasons for dissenting, and this statement I shall make without elaboration.

Governor Porter issued to Peelle a commission in March, 1883, and under that commission he entered into possession of the office. At the expiration of the term designated in the commission issued by Governor Porter, Governor Gray, then the Governor of the State, issued a commission to Peelle, and under these commissions he continued in undisturbed possession of the office, discharging its duties, and recognized as an officer *de jure*, by all the departments of the government until this action was brought. He entered into office under Governor Porter's commission, and continued under that of Governor Gray. He entered office, therefore, by executive sanction, and his continuance in office was by

executive authority; for, either this must be true, or else it must be true that no executive power or function was exercised in commissioning him, and surely in every commission there is some expression of executive judgment.

The law of the case, as declared on the former appeal, which controls us now, whatever may be our individual opinions, is that the legislative election in 1883 was utterly void; and if it was void Peelle could not have entered into the office, nor have held it under that election; for it is absolutely inconceivable that a void act can confer a right or title. But Peelle did go into office, and has continued there for nearly seven years, and the only power which could put or keep him there was and is that of the chief executive of the State; and the chief executive, by the commissions issued to him, authorized him to enter into the office and to continue in it, so far as it was in the power of the chief executive to do so. The chief executive alone had power to put and keep him in office, and it was the chief executive that did put him into office and continue him there by designating him as the person entitled to the office in the commissions issued to him. It seems clear to me that the only power to which Peelle's appointment is referable is the executive power, for there is no other to which it can, by any possibility, be referred.

The fact that Governors Porter and Gray recited in the commissions issued by them that Peelle was elected by the General Assembly, and that he was commissioned because he was so elected, does not prove that the minds of the chief executives did not assent to and confirm his appointment. They knew the law; they knew that they alone possessed the appointing power; and, knowing this, they designated him as the person to fill the office, and thus gave him the place by their own acts, for it was in their power, and in theirs alone, to withhold the office or to bestow it upon him. No other department of the government could bestow or withhold the office. The law, as declared on the former ap-

peal, is not a new law; for, according to the decision, by which we are bound, it has existed since the adoption of the Constitution, and it was known to the Governors of the State at the time the commissions were issued; for no man can be deemed ignorant of the law, certainly not the highest officers of the State.

Neither Governor Porter nor Governor Gray was the mere agent or clerk of the General Assembly; for, in appointing to office, the Governor exercises a power vested in him by the the Constitution. He is beyond legislative control in all cases where he exercises his constitutional prerogative, and that was exercised in this instance. What may be the power of the Governor under a valid statute is a question with which we have here not the remotest concern. Here the commissions were issued because the chief executive had the constitutional power to issue them by virtue of his prerogative. He could not, indeed, issue them by virtue of any other right or power vested in him.

In exercising his constitutional prerogative the Governor exercises his own will and judgment. No one can share the power with him, nor divide the responsibility. As the issuing of the commissions were executive acts, under the Constitution, they express the executive judgment and will, for they can express no other in a case such as this, where the Governor possesses the whole and the exclusive appointing power.

If either Governor Porter or Governor Gray exercised the constitutional prerogative of the chief executive—and in this instance no other could have been exercised—then what moved them to do it, or what reason, belief, motive or opinion influenced them is not a question for judicial cognizance, nor can it be under our Constitution. To attempt to ascertain in any mode or under any circumstances, or by any process or procedure, what influence controlled the mind and judgment of the Governor, would be an invasion of the executive domain which no authority will warrant nor any principle justify. If the courts can by one mode, whether

by examining the commission or by some other, inquire what belief, motive or opinion influenced the judgment of the Governor, they can do so in any mode, and this would subject the exercise of executive power to judicial control. Our Constitution expressly forbids that this should ever be done. It can not be said that there is one mode in which the inquiry may be prosecuted and no other, for once it is granted that the question is a judicial one, then all modes are open to the courts and they may probe the executive mind in every method known to the law. I affirm that the courts can not prosecute any inquiry for the purpose of ascertaining what influenced the Governor to issue a commission in such a case as this, for it is a question over which the courts have no jurisdiction.

In a case where the power to appoint resides exclusively in the Governor, and where he writes the name of a person in a commission and delivers it to him, he exercises his constitutional prerogative, for he can exercise no other. When it is ascertained that the Governor has issued a commission, there the power of the courts terminates.

No ingenuity of invention, nor any subtilty of argument, can make it appear otherwise than that in the judgment of Governor Gray and of Governor Porter, Peelle was the man entitled to the office. This was the executive judgment, and the executive judgment is conclusive, for the sole and absolute power of appointing to an office which it is the prerogative of the Governor to fill by appointment is in the Governor. His judgment, however influenced, no court can supervise. Even if it be true that the executive judgment was misled or was controlled by an erroneous view, still it was the executive judgment, and as such beyond review. The executive judgment was called into exercise and the executive pen wrote the name of the man designated to fill the office. If there was an exercise of executive judgment, no matter how invoked or upon what ground it proceeds, it is unimpeachable, for there is no tribunal that has jurisdic-

tion to investigate the question of executive conduct in cases where, as in this, the power of deciding resides wholly in the Governor.

It is useless to cite as authority or as illustrations cases where the appointing power is not exclusively vested in the Governor, for they have not the remotest application to such a case as this. Such cases prove nothing at all to the point, nor prove anything that anybody denies, for all concede that where the Governor has not the exclusive appointing power, his commission is not the vehicle for conveying the title to the office. But even in such cases it does convey some expression of the executive judgment.

It must be true that a commission issued by the Governor in a case such as this, where he has the whole appointing power, expresses his judgment, or it must be true that it is utterly void. To declare it void is to affirm that the highest officer of the State did a vain and idle thing, and this no court has power to do. Nor can it be assumed that the Governor, having the sole power to appoint, has violated his constitutional duty and his oath, and laid down his high constitutional prerogative at the feet of the Legislature. If it be adjudged that he yielded to an unconstitutional statute, surrendered his executive independence, and invested a man with the *indicia* of office, it is necessarily asserted that he wrongfully yielded his executive independence and violated his duty, and this assertion no court can rightfully make, for the plain reason that it can do no more than ascertain that the Governor has invested the man he names in his commission with the legal *indicia* of title. The act of issuing a commission, of itself and by its own force and vigor, expresses the executive judgment that the man named shall take the office, and no court can inquire what belief or opinion influenced the judgment of the chief executive.

The act of issuing a commission, where the Governor has the sole power of appointment, is absolutely, wholly and exclusively executive. It is impossible that it can be partly

executive and partly legislative. It embodies the judgment of the Governor—this it embodies, and this alone—for it can not embody the judgment of any one else on earth. If it embodies any part of the executive judgment, no court can inquire what influenced that judgment without usurping power that belongs to another department of the government.

It is not within the power of the courts to examine any evidence, whether supplied by the commission, by the books of the Governor's office, or by the oral statements of the Governor, for the purpose of ascertaining whether he was influenced by an insufficient or an illegal cause to clothe the man whose name he wrote in the commission with the *indicia* of office. President Garfield wrote upon the commission of General Wallace "Ben Hur," and surely no one would assert that it was competent for the courts to inquire whether the presidential judgment was influenced by that great book. If, however, they can inquire into the motives or opinions of the appointing power in any case, they can do so in such a case as that instanced as an illustration as well as in any other. The only defensible conclusion is, that, if the instrument is a commission, what is written in it has no force as evidence beyond the fact that the person named is designated as the one who, in the executive judgment, is entitled to the office specified, and the courts have no power to push their investigation beyond that point. I repeat that we are here dealing with a case where the sole right to appoint resides in the Governor, for the rule is different where the Governor has not the appointing power; back of him in such a case is the source of right and title, but where he has the exclusive power, he is the exclusive creator of title and right. He is the sole fountain of right and power. No more need be known, and no more can legally be known, by the courts than that he has designated a person to fill an office by writing his name in a commission and delivering it to him.

But if it be conceded (a concession that is wholly unau-

thorized) that the courts may search the commission to discover what belief, motive, or opinion controlled the mind of the chief executive and induced him to issue and deliver to the person designated the *indicia* of office, the utmost that can be said is that Governor Porter and Governor Gray were influenced by the legislative election to decide in his favor. Grant that this does appear, and so appear that the courts can regard it as evidence, and still it does not authorize the inference that the designation, or appointment, was not that of the Governor. All that can be inferred, awarding to the recital the utmost possible force as evidence, is that the legislative election influenced the two Governors, from whom Peelle holds commissions, to designate him for the office, for upon no principle of law or logic can it be assumed that those high officers yielded their official prerogatives to a void and dead legislative declaration. Those officers were bound, by the strongest and highest considerations that can influence men, to exercise their judgment, and to maintain the executive independence; and it must be assumed that they did their sworn duty, and did exercise their judgment. Either this must be true, or else it must be true that two of the highest officers of the State weakly yielded to legislative usurpation, and inexcusably surrendered their executive independence. But, more than this. If it be adjudged that the commissions were issued by the Governors because the Legislature bade them do it, then it is affirmed that two of the Governors of the State were ignorant of a principle of constitutional law and yielded, not to an actual command, but to a legislative declaration having not one spark of vitality. If it be conceded that the courts may search for evidence to prove what opinion, belief, or motive operated upon the mind of the Governor, it is much more reasonable to assume that the executive judgment simply coincided in the legislative selection or designation, and united with the Legislature in designating the person who should fill the office

than it is to assume that the Governor yielded to an invalid statute, and acted simply as the passive agent of the Legislature. The assumption suggested as the reasonable one leads to no unjust or evil consequences, attributes no ignorance to either of the Governors, nor imputes to them any violation of duty, whereas the assumption that the recitals in the commission show that the Governor issued the commission solely because of the legislative election convicts the chief executive of the State of ignorance of constitutional law, or else of a wilful violation of duty and an indefensible surrender of a high prerogative, and in either event leads to evil consequences.

To construe the recitals of the commissions as evidence of a breach of duty by the Governor, or of ignorance on his part, is a wide stretch of judicial authority, and, certainly, no such construction should be resorted to where, as here, it is reasonable and natural to infer that the Governor yielded to the influence of the legislative election, not because it coerced him, but because it persuaded or convinced him that the choice or selection was a proper one.   It is neither unusual nor improper, as every one knows, for the Governor to consult other officers or citizens, and recommendations are often made to the appointing power in behalf of applicants for office. This is illustrated by the cases where postmasters are designated by an election held by the people, for, while such an election may influence the President to make the appointment, it does not coerce his judgment, and if he should recite in his commission that the person so chosen was appointed because of his election, we suppose no one would think of questioning the validity of the appointment.   We have no more right in this instance to assume that the election by the Legislature coerced either Governor Porter or Governor Gray, than a court would have to assume, in the case supposed, that the election by the people had coerced the President.

If we are to strictly adhere to the words of the commission, and regard only the letter of the instrument, then the

commission given Peelle by Governor Porter is conclusive, for it is written therein that " in the name and by the authority of the State aforesaid I do hereby appoint and commission William A. Peelle, Jr., chief of the bureau of statistics." If the recitals control, then, it is impossible to deny that Governor Porter did appoint Peelle to the office.

Under the appointment made by Governor Porter, Peelle was inducted into the office in 1883, and he continued in office undisturbed until this action was brought, nearly seven years afterwards. For almost seven years he has been in office, and it seems to me very doubtful whether, after such a lapse of time, any one can be heard to aver that, when Governor Porter appointed him, there was no vacancy. I am, at all events, thoroughly convinced that the relator can not question the action of Governor Porter. To aver that there was then no vacancy is to aver that Governor Porter was ignorant of the law. And it is more, for it is to aver that for more than six years all of the executive, legislative, and administrative officers of the State were ignorant of the fact, if it be fact as assumed, that Peelle was a usurper. But still more than this, Mr. Conner, who, it is assumed, was the incumbent when Peelle was appointed by Governor Porter, yielded the office without objection, and asserts no title, for the title is here asserted by one who claims through an appointment made more than six years after the appointee of Governor Porter had taken possession of his office. I know of no authority, nor of any principle, that will authorize any court, or any officer, to sit in judgment on the action of Governor Porter at the demand of one whose sole and only claim to the office is an appointment made six years and more after Governor Porter's appointee took possession of the office.

Nor do I believe that it can be justly asserted that from the time Mr. Conner yielded the office it has been vacant. When Peelle entered the office, six years ago and more, under Governor Porter's appointment, the vacancy was filled,

or else Mr. Conner is still the officer *de jure*. That it was
in fact filled no one will deny. That it was so in law is my
firm conviction. It may be true that when Governor Por-
ter appointed Peelle there was no vacancy, but when Mr.
Conner yielded the office, as it is asserted he did do, there
was a vacancy, and this vacancy was filled by Mr. Peelle's
entrance under Governor Porter's appointment. As the sole
power of appointing was, at that time, in Governor Porter
his commission operated to place Peelle in office as soon as the
vacancy occurred, and Governor Gray's commission contin-
ued him there. It may be true (it is immaterial whether it
be so or not) that if Peelle's right had been challenged by
Mr. Conner, or if Governor Porter had commissioned an-
other, Peelle could not have rightfully held the office
under Governor Porter's commission, but however this
may be, it can not be true that what occurred under execu-
tive sanction, twice manifested, more than six years ago, can
be reviewed at the suit of one whose claim is founded on a
commission only a few months old.

It is assumed that Mr. Conner abandoned the office, and
if, therefore, it ever became vacant it became so when Mr.
Conner abandoned it in 1883, if he did abandon it, and at
that time the Governor of the State had an unquestioned
right to fill it, and Governor Porter did attempt, at least, to
fill it by appointing Mr. Peelle, and the only person who
could legally complain was Mr. Conner, for if Peelle's ap-
pointment was invalid, then Mr. Conner, by force of the
constitutional provision which rules the question, held over,
and he only was wronged.

In this case the relator has the burden of establishing two
things: *First.* The strength of his own title, and *Second.*
The weakness of Peelle's, and if he has weakened Peelle's title
it is because he has shown that Mr. Conner was entitled to
the office, and has thus shown that he has himself no title.
He is " hoist by his own petard." If, as the argument of
the relator assumes from beginning to end, the two Gov-

ernors who issued Peelle's commissions were mistaken as to the law, then, so we must presume, was Mr. Conner, and if he was he did not abandon the office, and he it is, who is now, upon the relator's own theory, entitled to the office. If Peelle by virtue of the unconstitutional statute under which the Legislature assumed to elect him has kept any person out of office it is Mr. Conner and not Mr. Worrell. If Mr. Conner were here claiming the office there would, to my mind, be much more difficulty in vindicating Mr. Peelle's claim, for if an officer yields to a law believed at the time by the executive and legislative departments of the government to be valid, and is by it coerced out of office, he can not be adjudged to have abandoned the office. But it is doubtful whether it would be competent, even at the suit of Mr. Conner, to reach back over a period of nearly seven years and review the action of Governor Porter; it is, however, quite clear that it is not competent to do it at the suit of the relator who was a stranger until May, 1889.

If Peelle wrongfully put any one out of office by entering into it, that one was Mr. Conner, and if there is any one who has a claim to the office, except Peelle, it is Mr. Conner. If there is and has been no vacancy in the office it must be for the reason that Mr. Conner was never rightfully ousted, and if there was no vacancy when Governor Porter and Governor Gray acted, there was none when Governor Hovey issued the commission to Mr. Worrell, six years later.

It is inconsistent to assert that Governor Porter and Governor Gray were coerced into putting Peelle into office and keeping him there by the legislative election, and that all they did was to obey the direction of the Legislature, yielding to it their own judgments and surrendering their own high constitutional prerogatives, and yet hold that Mr. Conner, in yielding to coercive measures that controlled the highest officers of the State, voluntarily abandoned an office to which he was of right entitled. To me it seems illogical to assert that the two Governors were so constrained by leg-

islative action that they did not exercise their free judgment and constitutional rights, and yet hold that a subordinate officer, who yielded to the same action of the Legislature, acted of his own free will and uncontrolled judgment and voluntarily abandoned his office.

If Conner did not abandon the office he is still the *de jure* officer, and if he is, the appellant's relator has not the shadow of a claim. Conner did not abandon the office if he merely yielded to the same power which, as the relator asserts, controlled and coerced Governor Porter, and left the office because he was forced by law to do so. It is impossible to conceive how it can, with consistency, be asserted that there was no vacancy in 1883, because Mr. Conner was the officer *de jure*, and yet be asserted that as Mr. Conner was forced out of the office in that year it lets the relator in six years later. Nor is it easy to conceive any rational theory upon which the relator can lay hold of Mr. Conner's rights to defeat Peelle, for as Mr. Conner is not before the court no question as to him can be determined, and, certainly, no right of Mr. Conner's can be made available to the relator who had not the remotest connection with the case until six years after Peelle, as the relator now claims, wrongfully asserted title against Mr. Conner.

The case seems to me very clear upon principle, but authorities are not wanting.

That executive powers and duties are beyond review by the courts is fully settled. *Smith* v. *Myers*, 109 Ind. 1, and authorities cited p. 7.

That the commission of an officer who, as is true of this case, has the sole and exclusive appointing power, is a conclusive expression of the judgment of the officer invested with that power, is affirmed in strongly reasoned cases, and, so far as I have been able to ascertain, is denied by none. In a case where the officer having the sole power of appointment, erroneously supposed that he must act upon the action of a legislative body, the court said : " The essential thing

is the fact of appointment. That might have been contained in a letter addressed to the persons appointed, or to the public. If the paper was signed for the purpose of making or evidencing the appointment, all the rest is mere matter of form and unimportant." *People, ex rel.,* v. *Fitzsimmons,* 68 N. Y. 514. In another case the court said: "In such a state of the case it is only necessary that the person claiming the office shall show that the officer having the power to appoint has exercised that power and decided in his favor." *Hoke* v. *Field,* 10 Bush, 144 (19 Am. Rep. 58).

That there is no abandonment of a public office where the person yields it in deference to a statute which is afterwards declared to be unconstitutional, is adjudged in the very strongly reasoned case of *Turnipseed* v. *Hudson,* 50 Miss. 429 (19 Am. Rep. 15), where the authorities are collected and ably reviewed.

That the law is that if Mr. Conner did not abandon the office by yielding to an unconstitutional statute, the implied or express declaration of Governor Porter or Governor Gray did not, and could not, create a vacancy is settled by our own decisions. *Board, etc.,* v. *Johnson, ante,* p. 145 ; *State, ex rel.,* v. *Harrison, supra.*

Whatever view may be taken of this case it seems clear to me that the relator has no title to the office, and if he has not, then there can be no question as to the correctness of the judgment of the trial court. Whether Mr. Peelle or Mr. Conner is entitled to the office is a much more doubtful question than the question presented by the relator's assertion of title.

MITCHELL, C. J., concurs in the opinion of ELLIOTT, J.